**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF PENNSYLVANIA**

ROBERT FERRANTE,

                          *Petitioner,*

          v.

DAVID CLOSE, in his official capacity as
Superintendent of State Correctional
Institution Houtzdale, and STEPHEN
ZAPPALA, in his official capacity as the
District Attorney for Allegheny County,

                          *Respondents*.

Case No.:  2:24–cv–1429

District Judge Christy Criswell Wiegand

Magistrate Judge Kezia O.L. Taylor

**PETITIONER ROBERT FERRANTE'S REPLY**
**IN SUPPORT OF PETITION FOR WRIT OF *HABEAS CORPUS***

# TABLE OF CONTENTS

I.    Robert's Constitutional Claims Are Not Procedurally Defaulted ...................................... 1

    A.    Robert has not procedurally defaulted his first claim, that the trial court violated his Sixth Amendment right to trial by a fair and impartial jury .................................... 1

    B.    Robert has not procedurally defaulted his second claim, that trial counsel provided ineffective assistance, facilitating trial by an unfair and impartial jury ................. 3

II.    *Even If* Robert's Claims Had Been Procedurally Defaulted, Robert's Actual Innocence is the Gateway that Overcomes Procedural Default ................................................................ 5

    A.    Actual Innocence is the gateway to overcome any procedural default .................. 5

    B.    Robert is actually innocent; the scientific evidence precludes a finding that Autumn was poisoned with cyanide ...................................................................................... 6

        *1.    The reliable scientific evidence proves that Autumn could not have been poisoned with cyanide* .................................................................................. 6

        *2.    Autumn died of natural causes* ........................................................ 13

        *3.    The circumstantial evidence presented by the Commonwealth is irrelevant and does not prove that Autumn was poisoned with cyanide* ............................... 16

III.    Robert is Being Held in Violation of his Sixth Amendment Right to Trial by a Fair and Impartial Jury.  (Claim I) ................................................................................................. 19

    A.    The venire was irreparably prejudiced, as was the jury that tried Robert............ 20

    B.    Trial by that irreparably prejudiced jury violated Robert's Sixth Amendment right—*which he did not waive* .............................................................................. 26

IV.    Robert is Being Held in Violation of his Sixth Amendment Right to Effective Assistance of Counsel, who Facilitated his Trial by an Unfair and Partial Jury.  (Claim II).............. 32

Robert Ferrante is an innocent man. Constitutional violations before and after his trial resulted in his wrongful incarceration and incarceration for over ten years. Robert's Sixth Amendment rights to a fair and impartial jury and effective assistance of counsel were denied.

The Commonwealth's Answer rests primarily on two arguments: first, it continues to argue that procedural issues should prevent this Court, like the Commonwealth's courts before it, from considering the merits of Robert's constitutional claims; and second, that the circumstantial evidence indicates Robert was guilty despite the scientific evidence that proves it was impossible for Autumn Klein to have been poisoned by cyanide. The Court should evaluate the constitutional violations that prevented a fair trial: (1) Robert's right to a fair and impartial jury was violated when a jury was selected from an Allegheny County venire saturated in prejudicial publicity, despite a prior judicial finding that a fair and impartial jury could not be empaneled in Allegheny County; and (2) Robert's trial and appellate counsel were ineffective in protecting Robert's Sixth Amendment rights.

## I.    Robert's Constitutional Claims Are Not Procedurally Defaulted.

### A.    Robert has not procedurally defaulted his first claim, that the trial court violated his Sixth Amendment right to trial by a fair and impartial jury.

Robert properly exhausted and asserted in the Pennsylvania courts the violation of his Sixth Amendment right to be tried by a fair and impartial jury. The Commonwealth admits that Robert exhausted this claim by raising it below but contends, in error, that Robert procedurally defaulted this claim by failing to raise it at the most appropriate time. Commw. Answer to Habeas Petition ("ECF 13") at 61. Specifically, it suggests that Robert's failure to raise his Sixth Amendment violation on direct appeal forecloses *habeas* relief. Not so.

This Court can review the trial court's violation of Robert's Sixth Amendment right even though Robert's appellate counsel failed to raise the issue on direct appeal, because Robert remedied appellate counsel's failure at the earliest possible time. *Habeas* relief is generally barred where a petitioner "has failed to meet the State's procedural requirement for presenting his federal [constitutional] claims . . . ." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). But Robert did meet the procedural requirements for presenting his claim of trial court error.

Robert's appellate counsel was ineffective for failing to raise on direct appeal the violation of Robert's Sixth Amendment right to an impartial jury. That same counsel represented Robert at the PCRA stage and repeated his error at that stage. PCRA counsel tried to raise trial counsel's ineffectiveness in withdrawing Robert's change of venire motion (Claim II herein), but PCRA counsel did not assert that *the trial court* violated Robert's Sixth Amendment impartial jury right. At the conclusion of PCRA proceedings, the PCRA court rejected the claim of trial counsel's ineffective assistance. On appeal from that PCRA order, Robert obtained new counsel (the undersigned). Under Pennsylvania law, retention of new PCRA counsel enabled Robert to allege for the first time on appeal that the trial court had violated his Sixth Amendment right to an impartial jury. *See* ECF 2-1 at 50–60, 66–70; *Commonwealth v. Bradley*, 261 A.3d 381, 404 (Pa. 2021) ("[W]aiver doctrine should not apply in these circumstances, as the issue preservation concerns underlying the doctrine simply cannot be applied where claims of ineffective assistance . . . arise upon the acquisition of new counsel, as it would be unreasonable to penalize a PCRA petitioner 'because his attorney didn't recognize and raise a claim of his own ineffectiveness . . . .'") (quoting *Commonwealth v. Shaw*, 247 A.3d 1008, 1015 (PA. 2021)); *see also Martinez v. Ryan*, 566 U.S. 1, 17 (2012) ("cause and prejudice" excuses potential default where "in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective" and the

underlying claim has at least "some merit). Appellate counsel and PCRA counsel were the same attorney, and thus, this issue was properly raised before the Superior Court in its review of Robert's PCRA denial. Pennsylvania law, and *Bradley*, permits claims of "layered ineffectiveness." Therefore, Robert has not procedurally defaulted this Sixth Amendment claim.[1]

**B.    Robert has not procedurally defaulted his second claim, that trial counsel provided ineffective assistance, facilitating trial by an unfair and impartial jury.**

The Commonwealth makes the same argument regarding Robert's ineffective assistance of counsel claim.  Once again, it admits that Robert exhausted his ineffective assistance of counsel claim by raising it below, but contends that Robert procedurally defaulted this claim by failing to raise it at the most appropriate time.  ECF 13 at 66.  Specifically, the Commonwealth suggests that differences between Claim II of Robert's *habeas* petition and his PCRA claims of trial counsel's ineffective assistance foreclose *habeas* review of Robert' claim.

*First*, there is no procedural default.  Robert first raised Claim II, trial counsel's ineffective withdrawal of his motion to change venue (which had already been granted), in his initial PCRA petition.  R.166–171.  Robert also supplemented what is now Claim II in amended PCRA filings (R.312–18) and presented evidence at a hearing held on the claim. R.4058–4249. The Commonwealth's assertion that Robert in some way procedurally defaulted this claim is, therefore, incorrect.  The PCRA court denied Robert's ineffective assistance claim, Robert presented further argument to the Pennsylvania Superior Court on appeal, and Robert petitioned the Pennsylvania Supreme Court for leave to appeal the Superior Court's affirmance of the PCRA court's denial.

---

[1] Also, because Robert is actually innocent, his conviction through violation of his Sixth Amendment rights is a miscarriage of justice further entitling him to relief.  *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  *See infra* Part II.

Therefore, Robert's ineffective assistance claim fully complied with Pennsylvania's procedural rules because it was properly raised and exhausted.

*Second*, even if Robert's ineffective assistance claim did not fully comply with Pennsylvania's procedural rules (it did), this Court can review the ineffective assistance offered by Robert's trial counsel even though Robert's PCRA counsel did not raise it in exactly the same form as here (ECF 1, 2), because Robert remedied all of PCRA counsel's failures at the earliest possible time.

Robert's PCRA counsel could have raised ineffective assistance of counsel fully and in the same form as here in Robert's initial PCRA petition but failed to develop the record at that time. To the extent any differences would prevent fulsome review here, PCRA counsel's shortcomings constituted ineffective assistance of PCRA counsel. To remedy such a mistake in Robert's initial PCRA petition, counsel would have needed leave to amend (which he neither sought nor obtained on the ineffectiveness claim—which would itself constitute error) or PCRA counsel would have had to allege his own ineffectiveness. *Commonwealth v. Spotz*, 18 A.3d 244, 329 n.52 (Pa. 2011) ("[C]ounsel cannot argue his or her own ineffectiveness."). At the conclusion of the PCRA proceedings, the PCRA court denied the claim of trial counsel's ineffectiveness, and Robert promptly obtained new, undersigned counsel. Under Pennsylvania law, the retention of new PCRA counsel on appeal enabled Robert to remedy in the Pennsylvania Superior Court any ineffectiveness of lower-court PCRA counsel. *See* ECF 2-1 at 50–60, 66–70; *Bradley*, 261 A.3d at 404 ("[W]aiver doctrine should not apply in these circumstances . . . upon the acquisition of new counsel, as it would be unreasonable to penalize a PCRA petitioner 'because his [prior] attorney didn't recognize and raise a claim of his own ineffectiveness . . . .'") (quoting *Shaw*, 247 A.3d at 1015); *see also Martinez*, 566 U.S. at 17 (2012) (cause and prejudice); *Murray*, 477 U.S. at 496

(manifest injustice). Robert's ineffective assistance claim was properly before the Superior Court in its review of Robert's PCRA denial because Pennsylvania law, and *Bradley*, permits claims of "layered ineffectiveness." Robert has not procedurally defaulted his ineffective assistance claim.[2]

## II. *Even If* Robert's Claims Had Been Procedurally Defaulted, Robert's Actual Innocence is the Gateway that Overcomes Procedural Default.

### A. Actual Innocence is the gateway to overcome any procedural default.

Robert is actually innocent and—despite the Commonwealth's misstatements in its Answer—he can and does plead actual innocence to obtain federal *habeas* relief. The Commonwealth argues that Robert can only assert his actual innocence if he establishes a miscarriage of justice by demonstrating that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986); ECF 13 at 78. As established in Robert's Petition for Writ of *Habeas Corpus*, Robert's Sixth Amendment rights to a fair and impartial jury and effective assistance of counsel were violated, resulting in Robert's imprisonment despite his innocence. Pet. Writ of *Habeas Corpus* ("Habeas Pet.") at 10–13, 22–27, 29, 31–33, 35–36, 38, 40, 43, 45–46.

The Supreme Court has held that actual innocence "serves as a gateway through which a petitioner may pass" even if the impediment is a procedural bar. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). The Commonwealth acknowledges that if a petitioner "presents evidence of

---

[2] For the same reason, Robert meets the cause and prejudice standard. *If* Robert's claims were procedurally defaulted for failure to raise them in his initial PCRA petition, the ineffectiveness of Robert's appellate counsel *caused* that default. Because Robert suffered the Sixth Amendment violation which would otherwise entitle him to relief from imprisonment and would have raised it but-for appellate counsel's ineffectiveness, the prejudice to Robert and his freedom is patent: because Robert's Sixth Amendment claims are meritorious as described herein, if appellate counsel had raised them at the first opportunity Robert would have been entitled to relief. Failure to raise the Sixth Amendment claims sooner, caused by ineffective appellate counsel, resulted in substantial prejudice to Robert, his right to be tried by a fair and impartial jury, and his liberty. Any default therefore should be excused.

innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup v. Delo*, 513 U.S. 298, 316 (1995); ECF 13 at 78. In assessing actual innocence, the court must evaluate whether a reasonable, properly instructed jury, would have found the defendant guilty. *Schlup*, 513 U.S. at 329.

**B.      Robert is actually innocent; the scientific evidence precludes a finding that Autumn was poisoned with cyanide.**

The evidence that Autumn died of natural causes, instead of by cyanide poisoning, is so strong that this Court cannot possibly have confidence that Robert's trial was free of nonharmless constitutional error. *Schlup v. Delo,* 513 U.S. 298, 316 (1995). A reasonable, properly instructed, and unbiased jury would not have found Robert guilty because: (1) it is scientifically impossible for Autumn to have ingested the amount of cyanide the Commonwealth's case relies upon; (2) the reliable evidence shows that Autumn died of natural causes; and (3) the Commonwealth's other evidence was inaccurate, unreliable, and irrelevant.

*1.   The reliable scientific evidence proves that Autumn could not have been poisoned with cyanide.*

Autumn could not have been poisoned by cyanide, and thus none of the circumstantial evidence relied upon by the Commonwealth is material. ECF 13 at 81–84, 98–104, 106–09. Autumn's organs, including her liver, were donated after her death. R.1276, 2878–82, 3028. Cyanide is highly corrosive; if Autumn had ingested cyanide her organs, particularly her liver, would have been significantly damaged and unsuitable for donation. R.1276, 2878–82, 3028; Mahieu, *Organ Donation After Fatal Poisoning*, QJM: An International Journal of Medicine,

Volume 92 Issue 7 (July 1999).[3] Not only was Autumn's liver suitable for donation, four years later, the liver recipient was doing so well that he wrote Robert a letter to thank him for the gift of life. R.170.149.

The Commonwealth's theory that Autumn was poisoned by cyanide finds scientific support only in a single, deeply-flawed blood test—the Quest blood test—despite other tests finding normal or no cyanide levels in Autumn's blood. ECF 13 at 88–91, 94, 96–97, 110, 113, 114. In fact, six cyanide blood tests were conducted by four organizations: (1) the Center for Organ Recovery and Education ("CORE") tested two blood samples utilizing Allegheny County Medical Examiner's Office ("ACME") labs, both of which yielded no cyanide presence; (2) NMS Labs tested one blood sample that yielded normal results of 0.3–0.5mcg/mL;[4] (3) ACME tested two blood samples that had positive *qualitative* results (consistent with the NMS test); and (4) Quest ran one blood test on a sample of hospital blood that resulted in an erroneous 2.2 mcg/mL. R.2048. NMS's VP of Quality Assurance, Robert Middleberg testified—and the Commonwealth ignores— that NMS uses different reagents that "tend to have less interference" than Quest, which explains the normal NMS levels compared to the astronomically high Quest results. R.2604–05. Additionally, NMS Labs ran two thiocyanate (cyanide biomarker) tests on Autumn's plasma, both of which yielded normal levels.[5] *Id.* The Commonwealth's reliance on Dr. Holstege's dismissal of

---

[3] https://academic.oup.com/qjmed/article/92/7/415/1696927.

[4] Cyanide levels up to 15 mcg/100mL "can be found in adults without symptoms." R.2055–56.

[5] Thiocyanate is a metabolite of cyanide. As cyanide breaks down it is turned into thiocyanate. Thiocyanate then gets excreted from the body through urine. If cyanide levels are elevated beyond non-lethal levels, high levels of thiocyanate would be found in blood and urine. Bhandari, et al., Cyanide Toxicokinetics, 38 J. Anal. Toxicol. 218 (2014), available at

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3977587/; Jillian Hamel, A Review of

Acute Cyanide Poisoning with a Treatment Update 31 Crit. Care Nurs. 71, 73-74

(2011), available at https://pubmed.ncbi.nlm.nih.gov/21285466/; Facts About

Autumn's normal thiocyanate levels is misguided because Dr. Holstege erroneously claims that thiocyanate levels rise when a person is poisoned with cyanide then continually decreases after blood draw. ECF 13 at 113. This ignores that thiocyanate has a half-life of 7–14 days; accordingly, the decrease from blood draw to test would be minimal (and any decrease could be calculated with a half-life analysis).[6]

If Autumn had consumed a lethal dose of cyanide, the CORE and NMS tests would have shown lethal levels; they did not. The NMS results revealed normal cyanide levels that would not have caused any medical symptoms. R.2584–85. The Commonwealth ignores Middleberg's testimony that if NMS' first assay resulted in a high concentration of cyanide, it would have been reported to ACME *and* a notation would have been made to dilute the sample on the next testing. R.2589. The Commonwealth attempts to discredit the NMS result by arguing that the test was conducted too long after the blood draw. Yet the Commonwealth concedes that the Mayo Clinic states whole blood is stable for testing at room temperature, frozen, or refrigerated for 14 days. ECF 13 95–97. Further, the Commonwealth omits Middleberg's testimony that toxicology literature confirms that blood samples with lethal levels of cyanide are not only stable for weeks and months after a blood draw, but still reflect fatal concentrations. R.2605–06. The ACME tests do nothing to prove Autumn had a lethal level of cyanide. They are binary tests: is there cyanide in the blood or not? The Commonwealth concedes this fact. *Id.* at 95. Even normal, non-lethal, levels of cyanide in the blood would yield positive results.

---

Cyanides, N.Y. DEPT. OF HEALTH (n.d.), available at https://www.health.ny.gov/environmental/emergency/chemical_terrorism/cyanide_te ch.htm#:~:text=In%20small%20doses%2C%20cyanide%20can,leaves%20the% 20bod y%20through%20exhalation.

[6] https://pmc.ncbi.nlm.nih.gov/articles/PMC6307002/#R7

The Quest Diagnostics test result, the only test that indicated Autumn's blood had abnormal levels of cyanide, was the centerpiece of the Commonwealth's case. The Commonwealth acknowledges the "critical" importance of the Quest results to its case. ECF 13 at 114. All of the Commonwealth's experts rely on this single unreliable and inaccurate blood test to conclude that Autumn was poisoned by cyanide. ECF 13 at 88–91, 94, 96–97, 110, 113, 114. That test was deeply flawed and profoundly unreliable.

To yield the Quest test result, Autumn would have had to ingest an impossibly concentrated amount of cyanide—an amount that, as discussed below, would have killed her immediately. Fourteen hours after Autumn was admitted to the hospital, her blood was drawn and sent to Quest for testing. R.1967. The original inaccurate Quest result indicated that the cyanide level in Autumn's blood was 2.2 mg/L. R.1440–44. For Autumn to have 2.2 mg/L of cyanide in her blood fourteen hours after she allegedly ingested it, she would have had to ingest 60–180 grams of cyanide within approximately ten minutes of returning home.[7, 8] *Id.*; R.1123. Sixty grams of cyanide is equivalent to the volume of two golf balls; 180 grams is equivalent to six golf balls. The Commonwealth relies on Dr. Holstege's testimony that a lethal dose of cyanide is 200 milligrams,

---

[7] The half-life of cyanide (the time it takes for cyanide to reduce by one half in the blood) is between 20 and 60 minutes. ECF 2-1 at 222 (Silverman Aff). To determine the amount of cyanide that Autumn would have had to ingest to yield results of 2.2 mg/L fourteen hours after ingesting, a reverse half-life analysis should be completed. *Id.* at 222–4. Reverse half-life analysis requires doubling the amount of cyanide each hour (for a 60-minute half-life) or every twenty minutes (for a 20-minute half-life), from the time the cyanide was allegedly ingested to when the blood was taken, then multiplying by five (multiplication by five represents the number of liters of blood in the average human (although Autumn Klein was small and underweight, use of the average is, again, most favorable to the Commonwealth's theory)). *Id.* Given the number of fluids, transfusions, and ECMO that Autumn underwent, these numbers would likely need to be even larger (if the Quest result were correct) to account for the dilution of Autumn's blood during treatment and transfusion.

[8] The Commonwealth claimed 8.3g of Cyanide was missing from Robert's lab. Autumn would have had to ingest 7 to 21 times that amount (to achieve 60 to 120 g of cyanide) to have 2.2mg/L of cyanide in her blood 14 hours after it was allegedly ingested.

which is less than half the size of a 500 milligram Tylenol capsule. If Autumn could not have consumed half a Tylenol capsule without instantaneous death, it would have been impossible for Autumn to consume, at minimum, two golf ball-sized portions of cyanide without suffering instantaneous death. ECF 13 at 112; *Potassium Cyanide: Systemic Agent,* National Institute for Occupational Safety and Health (NIOSH);[9] *see also* Def.Ex. W at 12 ("[T]he median oral lethal dose of potassium cyanide in an untreated adult is reported as [0.14–0.25g (or 140–250mg)]."); [10] R.4276; *Cyanide*, Center for Health Security, Johns Hopkins (Nov. 2, 2022) ("Exposure to potassium cyanide can be rapidly fatal.").[11] The Commonwealth relies on Dr. Holstege's testimony that not all patients poisoned by cyanide die instantly, and that the outcome depends on the cyanide dosage and how quickly and aggressively the patient received medical treatment. ECF 13 at 112. The Commonwealth also misconstrues defense expert Dr. Wecht's testimony that corrosive injuries from ingesting cyanide would depend on the dosage, to feign Dr. Wecht's support for the Commonwealth's evidence. ECF 13 at 116. The Commonwealth's Answer ignores two key factors: (1) that Dr. Wecht testified that if the Quest level of 2.2 mg/L 14 hours after alleged ingestion were accurate, that that amount would cause changes to the gastric lining; and (2) that Autumn would have had to ingest exponentially more cyanide than the lethal dose identified by Dr. Holstege—that would have undoubtedly caused corrosive injuries—to yield the Quest result, yet Autumn

---

[9] Available at
https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750037.html#:~:text=APPEARANCE%3A%20White%2C%20granular%20or%20crystalline,cyanide%20can%20be%20rapidly%20fatal (last visited Apr. 18, 2023).

[10] Petitioner understands Defense Exhibit W to be in the possession of the Commonwealth. It was last submitted to the Pennsylvania Superior Court, Western District, sitting in Pittsburgh on August 31, 2023. *See* ECF 2-1 at 22.

[11] chrome-
extension://efaidnbmnnnibpcajpcglclefindmkaj/https://centerforhealthsecurity.org/sites/default/files/2023-02/cyanide.pdf

lived for 60 hours after allegedly ingesting the cyanide and sustained no corrosive injuries. Emergency responders found Autumn's breathing to be normal, with adequate respirations. R. 2898; R.1197–1200, 1202, 1214–15, 1237, 1276–79, 4261. When Autumn arrived at the UPMC hospital she was conscious (but not speaking), eyes open, with low blood pressure and tachycardic (irregular, fast heartbeat). R.1215–16. The Quest result is inconsistent with Autumn's physical condition and therefore could not have been accurate. Autumn's clinical and pathological symptoms did not support cyanide poisoning. Ingestion of a lethal dose of cyanide causes death in minutes. *Cyanide*, Center for Health Security, Johns Hopkins (Nov. 2, 2022) ("Exposure to potassium cyanide can be rapidly fatal."). Her skin color was gray and ashen—not cherry red as typical in cyanide poisoning, or bluish or cyanotic as Dr. Holstege testified is common in cyanide poisoning. R.1237, 1277, 2541; ECF 13 at 111. Autumn's brain CT scan was normal, with no gray or white matter changes. R.1223, 1237. Further, had Autumn ingested that much cyanide, there would be significant, obvious burning, scarring, reddening, or corrosion of her mouth, lips, tongue, esophagus, and stomach. Autumn's autopsy showed no such evidence. R.2887–88; R.445–46; R.2607–08. Further, Dr. Wecht testified that Autumn's medical state would have greatly slowed her metabolism, causing any cyanide to remain in her stomach for a prolonged period of time and "reek [*sic*] its havoc," making the absence of changes in her stomach significant. R. 2898–99. Autumn's cardiac arrhythmic disturbance was considered a primary heart abnormality. After Autumn's death, her organs were donated, without incident. R.1276, 2878–82, 3028. These pathological findings are inconsistent with cyanide poisoning. Autumn died from her numerous undiagnosed and untreated medical conditions.

Direct evidence also proves that the Quest result was inaccurate and unreliable—and when properly calculated, revealed *normal* levels of cyanide. Quest technicians violated fifteen of their

Standard Operating Procedures ("SOPs"), any one of which would have negated the result. R.298–3066, 1742–44, 1932–40, 1980, 1987–92, 1995, 2014–15, 2023–24, 2037–38, 2045, 2055–56, 2100–02; R.2590, 2595–99, 2657, 2590, 2595–99, 2657. Quest employee Obcemea tested Autumn's blood sample fifty hours after the sample was drawn, and produced an admittedly erroneous result of 2.2 mg/L.  R. 967–80, 1945, 4278–82. The Commonwealth highlights that Obcemea was confident in her results and that it was the first lethal cyanide test she had observed in 37-year career conducting approximately 1,000 cyanide tests. ECF 13 at 89–90. Despite the result being higher than she had ever seen, Obcemea failed to retest Autumn's blood or check the controls to ensure accuracy (required steps in Quest's SOP). *Id.*; R.967–80, 1945. The Commonwealth's reliance on Obcemea's certainty and confidence is misplaced given her numerous violations of Quest's SOPs and errors in calculations. Quest employee Bartolotti reviewed Obcemea's findings and inexplicably adjusted the result—without retesting Autumn's blood sample—to 3.4 mg/L. R.1440–44. The Commonwealth accepts and dismisses Bartolotti's inexplicable confusion of the X and Y axes of the graph, despite allegedly performing 500 cyanide tests in his career, when adjusting the Quest results. ECF 13 at 90–91. Quest employee Brown noticed the calculation error 100 days later, and again without additional testing, changed the Quest result to 2.2 mg/L. R.2063–70. Two days after Brown's alteration, Quest employee Patrick Messina (supervisor and author of Quest's SOP) changed the Quest test result a *third* time, changing the units of measurement from 2.2 mg/L to 2.2 mcg/dL. *Id.* The Commonwealth argues that whether the Quest result is 2.2 mg/L or 3.4 mg/L is irrelevant, but does not address that the 2.2 mg/L is an erroneous result. ECF 13 89–91. ***The Commonwealth entirely ignores that properly converted, 2.2 mcg/dL (the final revision by Messina) is 0.022 mg/L, which is a normal cyanide level for a non-smoker***. *Id.*; R.2055–56.

The Commonwealth inaccurately argues that "even petitioner's experts did not discount the Commonwealth's evidence." ECF 13 at 117. Dr. Wecht's testimony regarding the validity of the Quest results was filled with qualifications, making clear that Dr. Wecht did not agree with the Commonwealth's evidence and disputed the reliability and accuracy of the Quest result. Dr. Wecht testified that *only if* the Quest "level were unequivocally correct and scientifically unchallengeable and there were no other findings of a likely conflicting nature … in the absence of any other explanation of death," would he agree that cyanide poisoning was the cause of death. R.2900–01. As explained herein, and at every opportunity prior, the Quest result is neither unequivocally correct nor scientifically unchallengeable—facts with which Dr. Wecht agreed. *Id.*

The scientific evidence indicates Autumn did not die of cyanide poisoning. There can be no confidence in Robert's guilt given this evidence. And there is more evidence—evidence that shows Autumn died of natural causes.

### 2.    *Autumn died of natural causes.*

Reliable evidence shows that Autumn died from natural causes, not cyanide poisoning. The Commonwealth states that Autumn was seen leaving UPMC "healthy" and then was inexplicitly admitted to the hospital later that evening. But the Commonwealth ignores that Autumn was texting Robert throughout the day that she was unwell: "I have an aura" and "Mild H A [headache] right now." ECF 13 at 80, 103; R.1572.

The Commonwealth's assertion that Autumn was healthy dramatically misrepresents the record. In concluding that Autumn could only have died from cyanide poisoning, the Commonwealth and Dr. Holstege ignore Autumn's numerous untreated medical abnormalities and disorders that led to her cardiac arrest. The heart pathology report from experts at the Jesse E. Edwards Registry of Cardiovascular Disease noted that Autumn had multiple, chronic, long-term

pathological abnormalities. Autumn was living with significant undiagnosed heart disease, including a bicuspid aortic valve, irregularities in the right ventricle, abnormalities in the arterial wall of the heart's conduction system, hemorrhage at the base of the right ventricle, a large plaque on the anterior right ventricle, and a confluence of abnormal dysplastic blood vessels at the entry of the heart's conduction system. R.2732–35, 2869–70, 2884. The latter undiagnosed condition, known as Torades de Pointes, likely caused her cardiac arrhythmia, syncope, and sudden death. R.1322, 2732–35, 4307–08; *see also* R.1219, 1251, 1314, 1322, 1371–72, 2865–70. The Commonwealth acknowledges that Autumn's aortic valves only had two, instead of three, cusps— an extraordinarily rare congenital condition affecting only two percent of the population. ECF 13 at 110. Dr. Luckasevic theorizes that this condition could not have been the cause of Autumn's death because her cause of death was lack of blood and oxygen to the brain. But this ignores that the lack of blood and oxygen to the brain was caused by Autumn's multiple cardiac arrests that deprived her brain of oxygen. *Id.* Dr. Rittenberger, a UPMC Physician and Commonwealth witness, testified that patients "die after cardiac arrest because of brain injury." R.1306. Autumn was revived twice after two cardiac arrests in the emergency room, depriving her brain of oxygen and causing significant brain injury, as reported in Autumn's neuropathology report. R.1289. These congenital conditions were completely unrelated to any presence of cyanide. "[C]yanide is a very unusual substance to consider for cardiopulmonary collapse," and doesn't explain Autumn's cardiac arrest. R.1289–95. The Commonwealth ignores Dr. Rittenberger's explanation that given an incomplete block of Autumn's heart rhythm along with syncopal episodes, he would expect a "brugada or channelopathy," which are mitochondrial abnormalities that can lead to sudden death. R.1314, 1322, 1329. Autumn had headaches, visual auras, and syncopal episodes since approximately February 2011; she nearly fainted in church and experienced waves of nausea and

frontal head pressure. R.164.86; Def.Ex. UU; T.15.134, 166, 229, 286–87. Autumn's cardiopathology report showed significant heart disease and pathology, including that Autumn had a diagnosed mitochondrial abnormality that resulted in infertility. *Id.* In fact, CORE rejected Autumn's heart as it was "medically unsuitable" for donation; notably, CORE identifies "black nodules" found on Autumn's heart and lungs. R.1016, 1021-22.

These serious and congenital heart conditions were not the only health issues Autumn faced. Autumn also suffered from hypothyroidism (R.1298) and anorexia (R.1207, 1268), the latter of which can cause sudden death due to cardiovascular complications. *See* Beatriz Jauregui-Garrido, Ignacio Jauregui-Lobera, *Sudden Death in Eating Disorders*, NIH National Library of Medicine (2012).[12]

As endorsed by her IVF physician, Autumn was also using a high dosage of creatine to treat infertility caused by her mitochondrial disorder. R.2971. Since Autumn was ovulating, and responding well to the creatine, Autumn rapidly escalated her dosage and was taking the maximum dose of 10 grams daily for over a month. R.2971. Although isolated small doses of creatine may not have obvious side effects, repeated doses can lead to a buildup of symptoms, including high or low blood pressure, nausea, chest pain, frequent headaches, eye pain, difficulty breathing, and even vomiting or confusion. Accordingly, Autumn's creatine usage may have exacerbated her underlying heart condition, triggering her emergency medical event. *See, e.g.*, Ryan Kammer, *Lone Atrial Fibrillation Associated with Creatine Monohydrate Supplementation*, 25 Pharmacotherapy 762 (2005). Creatine can also cause false positives for cyanide. R.2866–68, 2870–73, 2875; R485–88. "Known interferences with this [testing] method include cyanogens … whereby falsely

---

[12] https://pmc.ncbi.nlm.nih.gov/articles/PMC3292410/

elevated results might occur … It is reported that [creatine] can contain a number of contaminants, some of which are cyanogens … [which] can generate cyanide." R.4282. The Commonwealth notes that Dr. Holstege had never heard of someone dying from creatine toxicity or tainted creatine but fails to address creatine's known interferences and false positives for cyanide. ECF 13 at 114. The credible evidence indicates that Autumn died of natural causes.

### 3. *The circumstantial evidence presented by the Commonwealth is irrelevant and does not prove that Autumn was poisoned with cyanide.*

Because the scientific and physical evidence establish that Autumn died of natural causes, the Commonwealth relies on a lengthy recitation of the circumstantial evidence—itself inaccurate and incomplete. ECF 13 at 81–84, 98–104, 106–09. That reliance misses the point: if the scientific evidence shows that Autumn was not poisoned as the Commonwealth alleged at trial, nothing else matters. That is, if the scientific evidence relied upon by the Commonwealth to prove Autumn was poisoned is flawed and the medical evidence establishes Autumn likely died of natural causes, Robert is innocent. The circumstantial evidence does not change that conclusion. Not surprisingly, an analysis of the circumstantial evidence finds it unpersuasive.

Robert was working to cure ALS and Huntington's disease. R. 2953. The Commonwealth attempts to frame Robert's cyanide purchase as evidence of premeditation; but it was made to support his research. ECF 13 81–82. Robert's research involved trying to mimic cell death caused by ALS and Huntington's Disease. R.2953. After other reagents were less effective at causing cell death, Robert chose to use cyanide. R.2959. To receive grant funding for his research utilizing cyanide, Robert needed proof of concept. So, he asked a departmental assistant to order potassium cyanide from an approved supply company.[13] R.2906, 2977–79, R.4265 (Sigma-Aldrich Order

---

[13] Robert submitted his grant proposal to receive funding for his research. Defense Exhibit C.

Confirmation). The assistant placed the order using a university credit card and delivered the order to his lab, where he opened it in the presence of an employee of the lab. R.2959, 2980. He had the cyanide overnighted so he could begin work on his hypothesis as soon as possible. If Robert's cyanide purchase were made to poison Autumn, as the Commonwealth asserts, he could have easily used cyanide from the lab he shared with Dr. Friedlander—cyanide that was available and stored in an unlocked communal refrigerator. R.1544–48. Instead, because Robert's purpose was to further his research, he openly discussed his plan to use cyanide as a reagent in a meeting of multiple lab groups the previous December. And he openly requested departmental assistance in ordering the cyanide. R.2906, 2977–79, R.2959, 2980. These are not the actions of a man planning to kill his wife.

The Commonwealth presents countless irrelevant internet searches allegedly conducted by Robert that do nothing to prove Autumn was poisoned by cyanide. ECF 13 at 98–102. The only relevant searches presented by the Commonwealth are those regarding cyanide, which have two simple explanations. In early 2013, Robert did basic research, pursuant to university protocol, to prepare for the presence of cyanide in his lab and to keep his researchers safe. Robert's role as Laboratory Director was to ensure that everyone potentially exposed to cyanide in his lab would be safe. As a responsible scientist dealing with a new toxic reagent in his laboratory, Robert investigated how to handle potassium cyanide safely. R.2823. In fact, UPMC pathologist Harry Blair testified that when preparing to use a new product in the lab "you Google it and follow the training for whatever it is you're buying." R.1203. Once Robert learned that Autumn's blood was being tested for cyanide, Robert sought to understand what could have happened to Autumn. He was confused and concerned. R.2996. He wanted to understand what happened to his wife, so he researched everything he could in an attempt to make sense of what he was hearing from the local

news media. *Id.* The Commonwealth misconstrues Robert's daughter, Kimberly Ferrante's, testimony, arguing that Ms. Ferrante's account of how she learned of the cyanide test was inconsistent—that she initially stated a cardiologist or cardio-thoracic surgeon told her about the test then later stated she overheard the cyanide test was being performed by two nurses. ECF 13 at 118. This misconstrues the nature of Ms. Ferrante's testimony, in which she began to explain information she heard from a cardiologist or cardio-thoracic surgeon, but was unable to finish her statement because an objection was made and sustained. R.2928. Ms. Ferrante later explains that she learned that a cyanide test was pending while Autumn was in the hospital because she overheard two nurses discussing it at the nurse's station. R.2934. Ms. Ferrante told Robert that a cyanide test was pending and that a cyanide test is not a part of a regular toxicology screen. R. 2929. Robert also learned that Autumn's liver and kidneys were donated to CORE. He was concerned about the recipients' well-being if they had been exposed to cyanide as alleged. R.3028. He even contacted CORE to make sure they were aware of the potential of cyanide poisoning.

The Commonwealth tries to paint Robert as a husband seeking divorce or murderous revenge due to his wife's potential infidelity. ECF 13 at 105–06. The unrebutted evidence is to the contrary. Robert and Autumn were actively trying to conceive a second child. Robert assisted these efforts by attending IVF appointments; seeking out the best IVF physicians—even traveling great distances to see these physicians; and researching and acquiring the best supplements (creatine) to assist with fertility. R.1335–37; R.2961–62. Although their relationship endured through challenges, both Robert and Autumn clearly saw a future together and were working toward building a family. R.1335–37; R.2961–62; ECF 13 at 103.

Robert declined an autopsy for Autumn, not because he was attempting to hide evidence of cyanide poisoning as suggested by the Commonwealth, but for two harmless reasons: (1) to

honor Autumn's wishes of being an organ donor; and (2) his extensive experience treating patients and families with genetic disorders gave him an appreciation for the psychological effects the knowledge of a genetic abnormality could have on his then six-year-old daughter. R.132–28; R.2993.

The Commonwealth's reliance on the fingerprint examiner's testimony that Robert's fingerprint was on the Sigma Aldrich cyanide bottle is unrevealing. ECF 13 at 111. Robert testified that he and another member of his lab examined the cyanide bottle after its arrival. R.2959, 2980. That Robert handled a cyanide bottle that he requested for his research does not support a finding that Autumn was poisoned by cyanide.

The evidence presented by the Commonwealth does not support the conclusion that Autumn was poisoned with cyanide. Even Judge Manning stated that he "would not have predicted [the verdict] here." R.327–28, 369 (Judge Manning on DATELINE NBC). Considering the scientific impossibility of the Quest result, the normal cyanide results of the NMS tests, the normal thiocyanate levels, Autumn's numerous ailments leading to her natural death, and the Commonwealth's irrelevant circumstantial evidence, a reasonable, properly instructed, unbiased jury, would not have found Robert guilty. Robert has met his burden of presenting "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial" without determining that the trial was free from "nonharmless constitutional error." *Schlup v. Delo*, 513 U.S. 298, 316 (1995). The Court should find that Robert's actual innocence serves as a gateway to address his constitutional claims even if it finds procedural issues with that review.

## III.  Robert is Being Held in Violation of his Sixth Amendment Right to Trial by a Fair and Impartial Jury.  (Claim I)

The Pennsylvania Court of Common Pleas violated Robert's right to trial by a fair and impartial jury when it empaneled a jury from a venire it previously ruled was subject to "pretrial

publicity . . . on the jury pool" such that "a fair and impartial jury cannot be impaneled" therefrom. *See* ECF 2 ¶¶ 51–62; R.1082 (May 6, 2014 venire sampling); R.6 (May 7, 2014 order on change of venire). If "a jury is to be provided the defendant, . . . the jury must stand impartial and indifferent." *Turner v. Louisiana*, 379 U.S. at 472, n.10 (1965); *Reynolds v. United States*, 98 U.S. 145, 155 (1879) ("[A] juror who has formed an opinion cannot be impartial."). Robert was tried by an unfair and partial jury selected from a venire saturated with prejudicial publicity. As set forth in the Petition, the trial court conducted a series of inquiries to three separate venires brought in at three separate times in considering the motion to change venue. The trial court's venire examinations (R. 1063, 1074, 1080) and resulting order are unequivocal that the Allegheny County venire could not provide a fair jury trial. R.6. But a jury was empaneled from that very Allegheny County venire without regard for Robert's Sixth Amendment right. *See* ECF 2 ¶¶ 17–24, 51–62.

### A.  The venire was irreparably prejudiced, as was the jury that tried Robert.

The Commonwealth has never contested, sought reconsideration, appealed the trial court order, nor have they argued in any post-trial proceeding that the trial court should have denied Robert's motion for a change of venire.  Even now, the Commonwealth's Answer does not deny that the jury was seated in contravention of the trial court's May 6, 2014, order.[14]  Instead, the Commonwealth only argues that Robert did not suffer any "actual" prejudice.  In the Commonwealth's view, Robert could not have suffered prejudice because the seated jurors who

---

[14] The Commonwealth's Answer remarks that publicity alone does not require a change of venue.  *See* ECF 13 at 64 (citing *Martin v. Warden, Huntingdon State Corr. Inst.*, 654 F.2d 799, 805 (3d Cir. 1981)). "Publicity alone" was not the issue in Robert's case, where the trial court determined pretrial publicity had provided a critical mass of potential jurors knowledge about Robert's case—knowledge that enabled a critical mass of those potential jurors to make up their minds about Robert's guilt.  *See* ECF 2 ¶¶ 20–22. That's why the trial court determined, with no objection from the Commonwealth, that a change of venire was necessary because "a fair and impartial jury cannot be impaneled in th[at] Judicial District." *Id.* ¶ 22.

had heard about Robert's case in the media claimed they could set their knowledge aside. ECF 13 at 65. The Commonwealth's claim that this self-evaluation remedied any bias is without merit.

First, prejudice is established by the trial court's unequivocal factual findings of the Allegheny County venire's knowledge of Robert's case and the venirepersons' fixed opinions based thereon and its resulting conclusion that a fair and impartial jury could not be impaneled. *See* ECF 2 ¶¶ 51–62; R.1082, 6. The Commonwealth's own cited authority, *Provenzano*, is clear on that point. *See* ECF 13 at 64 (citing *United States v. Provenzano*, 620 F.2d 985, 995 (3d Cir. 1980)). That case states that prejudice *"is to be presumed"* "in cases where the influence of the news media pervaded the proceedings." 620 F.2d at 995 (citing *Murphy v. Florida,* 421 U.S. 794, 799–800) (emphasis supplied). That is exactly the finding made by the trial court here, after extensive fact finding necessitating the change of venue. *See* R.6, 1082. Therefore, no further examination of juror prejudice is necessary, as prejudice should be presumed. *Id.* Nevertheless, as discussed below, the jury empaneled for Robert's trial was actually prejudiced by rampant pretrial media.

Second, the trial court did not examine the venire's *actual* exposure to prejudicial pretrial media—including that of jurors who were seated in Robert' trial. The trial court's *voir dire* on media exposure was cursory. In its own words, the trial court apparently believed the jurors' actual exposure was not of any concern, telling one juror: "I don't have to ask you what you read or heard. . . ." *See*, *e.g.*, R.3521–22.[15] Thus, Robert's counsel could not intelligently exercise

---

[15] The Court: I don't have to ask you what you read or heard, the real question goes to the next question that we ask, that is whether or not you formed a fixed or unalterable opinion about the case that makes it impossible for you to be fair and impartial?

Juror No. 14: That is difficult because what I read did lean toward this person being guilty. Partially it is the way The Press had stated it.

The Court: Well, sure.

challenges for cause or peremptory challenges in order to mitigate, if possible, the effects of the prejudicial publicity.  The trial court's failure to examine jurors' actual exposure to media led to a jury comprised overwhelmingly of individuals who had previously heard about Robert's case.  *See* ECF 13 at 65 (recounting each seated juror, eight (of twelve) of whom had heard about Robert's case); *see also*, *e.g.*, R.3499–3504 (seating juror who read Pittsburgh paper every day, which covered the case extensively—yet denied any knowledge about the case—without further examination).

Third, when potential jurors *had* heard about the case (and almost all of them had), the trial court improperly accepted the potential jurors' own belief that they could set aside what they heard.  *See* R.3726–3892.  Even as characterized by the Commonwealth, **eight of the twelve jurors seated** had heard about Robert's case.  *See* ECF 13 at 65. In the context of a case overwhelming dubbed by the media as "the cyanide murder case," this is unfairly prejudicial.  Courts, including those cited by the Commonwealth, *id.* at 64, agree that a juror's impressions of their own ability to set aside what they know about a case is often inaccurate and is not dispositive. *See Provenzano*, 620 F.2d at 995, citing *Murphy,* 421 U.S. at 799–800 ("A juror's own assurance of [his "capab[ility] of abandoning his prior impression and rendering a fair verdict"] is not the final determinant."); *United States v. Mitchell*, 690 F.3d 137, 142 (3d Cir. 20120); *United States v. Torres*, 128 F.3d 38, 45 (2d Cir. 1997); *Tumey v. Ohio*, 273 U.S. 510, 532 (1927); *see also* R.314–16 (compiling impressions of Robert's guilt held by unselected jurors as a result of pretrial media).  The trial court had already concluded that the rampant pretrial media attention on Robert's case was

---

Juror No. 14:  I think it would be near impossible for someone not to be swayed in that direction.  You just can't help it.

R.3521–22.

pervasive enough to prejudice the entire county against Robert. If it were possible to offset that prejudice, the trial court did not even attempt to do so during *voir dire*. Even so, the court empaneled a jury, three quarters of whom had heard about Robert's "cyanide poisoning case" from local media coverage—coverage that the court had already concluded was impermissibly prejudicial.

The Commonwealth's one-page summary of the seated jurors' pre-trial media exposure misrepresents several of the jurors' familiarity with Robert's case. ECF 13 at 65. Starting with Juror #3, the Commonwealth says her "only knowledge was from what other people told her when she was selected for jury duty." ECF 13 at 65. In reality, Juror # 3 understood Robert's trial to be for "a cyanide poisoning case." R.3726. She had told a colleague about jury duty, and the colleague informed Juror # 3 that the jury in Robert's case, "a cyanide poisoning case," was starting at the same time and told Juror # 3 "a little bit about it." *Id.* The trial court did not inquire further into what Juror # 3's colleague told her "about it," and the record is silent on what else Juror # 3 knew about Robert's case before she was empaneled. But the record is unequivocal that the trial court—contrary to its own finding that it could not seat a fair and impartial jury from Allegheny County—proceeded to seat a jury from Allegheny County with the first seated juror knowing already that she would be presiding over "a cyanide poisoning case," thus assuming the central, contested fact in the case.

Juror # 12 stated she had heard about Robert's case on TV, and the trial court did not press this juror any further when she offered the explanation that she could not "remember" what she had heard about it. *See* R.3766. Nor did the trial court or Robert's counsel inquire about this juror's other potential ground for prejudicial knowledge and dismissal—her employment connection to the University of Pittsburgh Medical Center where Autumn worked and was treated

before her death.  *Id.* at 3767.  The juror could have been a colleague of Autumn's or could have been working at UPMC at the time of her death.  But that issue was not examined (Robert's counsel did not ask questions of Juror # 12).  *See also id.* at 3770 (showing her work relationship with one of the trial witnesses).

The Commonwealth characterized Juror # 22 as knowing nothing about the case "because he did not have the time."  ECF 13 at 65.  But that was not accurate.  When asked if he "ha[d] no idea" "as to what the allegations are," Juror # 22 disagreed: "I wouldn't say I have no idea.  I have some sort of idea."  R.3822.  He explained he remembered a case about poison that instantly came to his mind when he learned Robert's case was a homicide.  *Id.*  Despite his instant association of this case with homicide by poison, neither the court, nor counsel, inquired any further.  The court simply seated him.

The Commonwealth characterized Juror # 37 as knowing from the news that the jury was being selected that day.  ECF 13 at 65.  The Commonwealth's characterization omits that this juror recalled charges first being filed against Robert: "It [what he heard] would have been on the local news where it was charges were filed against a doctor, a local doctor, a Pittsburgh doctor."  R. 3885.  Juror # 37's *voir dire* revealed that his knowledge of Robert's case spanned from the indictment until trial.  But neither the court nor counsel inquired further into his knowledge.  *See id.* at 3885–87.  The court seated him.

The Commonwealth characterized juror # 38 as saying "he just heard it on the news."  ECF 13 at 65.  More could be known about what Juror # 38 knew about Robert's case.  But the court told this juror he did not have to tell the court what he knew about Robert's case, just that he could set it aside.  R.3889.  Juror # 38 revealed that he had a knowledge of the details of the case as reported in the media.  He had heard on TV "that the defendant was being charged for killing his

wife with a drug that was purchased from a campus credit card." R.3891. Juror # 38 confirmed that the case "is all on the news." R.3892. Nevertheless, the court seated him.

In addition to these **five jurors** who knew details of Robert's case ahead of trial, three others had read about or knew about the case. *See* ECF 13 at 65.

A closer look beyond the Commonwealth's superficial description of the seated jurors' knowledge of Robert's case reveals that the jury could not avoid damaging pre-trial publicity— just as the trial court had previously ruled. The trial court and defense counsel failed to fully examine the jurors' knowledge. Eight of the jurors knew about Robert's case before presenting for jury duty. Some even knew that the case was one of poisoning by a doctor. The jurors' knowledge about the material facts of the Commonwealth's case, including that it was "a cyanide poisoning case," R.3726, demonstrates prejudice that Robert suffered by being tried by a jury awash in rampant pre-trial publicity. This prejudice was exacerbated because the jury was not sequestered for the ten-day trial, during which time local media coverage was even more intense.[16] Therefore, the Commonwealth's suggestion that jury selection remedied any potential prejudice to Robert is false.

In fact, the twelve-juror panel for Robert's trial, to a person, knew more about Robert's case than any of the venire examinations the trial court conducted in concluding the venire must be changed. The trial court's second examination on April 30, 2014, found that 49 of 67 (73%) venirepersons had heard about Robert's case, more than two-thirds of whom (35 of 49) held fixed opinions. In comparison, 75% of Robert's jury had heard about his case. That none of those jurors held fixed opinions is statistically improbable if not impossible.

---

[16] Jury selection was a day and a half, trial testimony was ten days, and jury deliberations were approximately ten hours.

Robert is entitled to relief because his Sixth Amendment right to trial by a fair and impartial jury was violated by the empaneling of a jury with existing, prejudicial knowledge of his case. *See Wall v. Purdy*, 465 F.2d 933 (5th Cir. 1972) ("If there was no valid waiver of the appellant's Sixth Amendment right" "he is entitled either to have his conviction and sentence of imprisonment set aside . . . ." or given a new trial.) (citing *Argersinger v. Hamlin*, 407 U.S. 25 (1972)).  Since Robert was tried before a jury from an unfair and partial venire without his consent, he is entitled to release or a new trial before a jury selected from a fair and impartial venire.

**B.    Trial by that irreparably prejudiced jury violated Robert's Sixth Amendment right—*which he did not waive.***

Trial by an unfair and partial jury violated Robert's Sixth Amendment right.  Robert was entitled to trial by a *fair* and *impartial* jury, a right only he could waive.  He did not waive.  *See* ECF 2 ¶¶ 62–83; *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("[C]ourts indulge every reasonable presumption against waiver" and "do not presume acquiescence in the loss of fundamental rights.").

The Commonwealth's Answer asserts without credible evidence that Robert waived his right to trial by a fair and impartial jury. *See* ECF 13 at 69–72; *but see,* ECF 2 ¶ 35 (They characterize the transcript of a waiver as "unavailable," ECF 13 at 69, though the evidence below explains that a transcript would have existed if the colloquy had been conducted).  Specifically, the Commonwealth offers the "recollections" of Judge Jeffrey Manning and a deputy district attorney, Kevin Chernosky, that Robert supposedly waived the change of venire the trial court had granted.  ECF 13 at 69–72.  Both recollections are unreliable.  But even if taken as true, they are not evidence of a legally sufficient waiver by any constitutional metric.

First, the Commonwealth-offered "recollections" are contrary to the evidence.  There is no transcript of any proceeding in which Robert waived his Sixth Amendment right or consented to

the withdrawal of the trial court's order changing the venire.  ECF 2 at 36.  Court reporting personnel testified in Robert's PCRA hearing that no transcript or any other record of a waiver proceeding existed.  *Id.*  The transcripts of proceedings that do exist confirm that only assistant district attorney Lisa Pellegrini and Robert's trial counsel, William Difenderfer and Wendy Williams, but ***not*** deputy district attorney Kevin Chernosky, were present in court the day Robert's trial counsel withdrew the granted change of venire motion—September 2, 2014.  *See id.*; R.383. Wendy Williams testified at the PCRA hearing that Robert was not present in court on September 2, 2014; he was not admonished of any Sixth Amendment right to trial by an impartial jury; and no colloquy or waiver occurred.  *See* ECF 2 ¶ 36.  No contrary testimony was offered by anyone who the record confirms was present on September 2, 2014.  *Id.*  Nevertheless, the Commonwealth points to the testimony of deputy district attorney Chernosky, whose presence on that day is not supported by the record.  ECF 13 at 71; ECF 2 ¶ 36.  Chernosky's opportunistic testimony is outweighed by Williams' testimony that Robert did not waive his change of venire granted to ensure trial by a fair and impartial jury.  *See also* ECF 2-1 at 215–16 (trial counsel Difenderfer's declaration that "a colloquy did not occur as there certainly would be a record of it and I would remember it."). Nor should any weight be given to Judge Manning's "recollection" of a colloquy because any such recollection is "incompetent" under Pennsylvania Rule of Evidence 605.  *See* ECF 2 ¶ 25, n.7. Moreover, any such "recollection" of waiver by Robert is inconsistent with Judge Manning's own prior finding that *counsel*, not Robert, had withdrawn the change of venire. *See id.* (Aug. 27, 2019, PCRA Order) (citing R.268).

Second, even if the unreliable recollections of Manning and Chernosky were not contradicted by reliable testimony and direct evidence and were taken as true, they still would not show a valid waiver of Robert's fundamental right.  Robert's Sixth Amendment right to a fair and

impartial jury may only be diminished by a knowing, intelligent, and voluntary waiver.  ECF 2 ¶¶ 64–66 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 237 (1973)).  Neither Judge Manning's nor Chernosky's "recollections" provided any indication of the substance of any waiver or colloquy proceeding. Chernosky was asked whether he would "be able to tell the [PCRA] judge what questions were asked and what answers the answer were" for the colloquy he remembered. He answered, "I couldn't tell you what questions were asked and what order they were, what the answers were, no."  R.4242.  The purported recollections did not include any admonishment or warning that Robert was supposedly given in advance of the Commonwealth's alleged waiver. Nor did they recall what the Court or counsel asked Robert to ensure that his waiver was made knowingly, intelligently, or voluntarily. Therefore, the "recollections" are insufficient to support the Commonwealth's assertion that Robert waived any right.  *See Zerbst*, 304 U.S. at 464 ("[C]ourts indulge every reasonable presumption against waiver" and "do not presume acquiescence in the loss of fundamental rights.").

The Commonwealth further suggests, in error, that "the absence of an oral [waiver] colloquy is of no moment."  ECF 13 at 72.  While the Constitution does not require a specific proceeding, colloquy, or written form to effectuate a waiver, the Constitution does require waiver of fundamental rights—like that to a fair and impartial jury—to be knowing, intelligent, and voluntary. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986); *New York v. Hill*, 528 U.S. 110, 114–15 (2000); *Schneckloth v. Bustamonte*, 412 U.S. 218, 237 (1973); *Patterson v. Illinois*, 487 U.S. 285, 300 (1988). The Constitution also requires that a defendant be allowed "to make his own choices about the proper way to protect his own liberty." *Weaver*, 582 U.S. at 295; *McCoy*, 584 U.S. at 422; *see also Cochran*, 369 U.S. at 515 (requiring record of accused's waiver). A waiver colloquy is not the only means of assessing the validity of any individual waiver or ensuring that

an accused's role in his defense is preserved. But a colloquy ensures that any relinquishment is made with the defendant's involvement and is knowing, intelligent, and voluntary. Less formal processes (like allowing counsel to waive a fundamental right in the defendant's absence) offer no indication those requirements have been met. A waiver colloquy is sufficient to establish the propriety of defendant's waiver; situations like Robert's where there are no indicia of a knowing, intelligent, or voluntary waiver are exemplary of the need for a waiver colloquy to ensure that fundamental rights are not improperly forfeited.

The Commonwealth quotes *Vickers* for the proposition that "an on-the-record waiver, while probative and strongly encouraged, is not a prerequisite to a knowing and voluntary waiver and, hence, is not constitutionally required." ECF 13 at 72 (citing *Vickers v. Superintendent Graterford SCI*, 858 F.3d 841, 853–54 (3d Cir. 2017). *Vickers* is inapposite. First, *Vickers* is factually distinguishable because there was abundant evidence that Vickers's trial counsel proceeded to a bench trial only after numerous conversations with Vickers about the benefits of a bench trial in his case, at the conclusion of which Vickers "indicated he wanted to go forward with a bench trial." 858 F.3d at 846 (cleaned up). Such facts are not present here. And second, *Vickers*, though not requiring any particular waiver proceeding, does restate the requirement that waiver of a fundamental right must still be knowing and voluntary. As stated in Robert's Petition, he provided no waiver of his change of venire in any form to either his trial counsel or the trial court, formally or informally. *See*, *e.g.*, ECF 2 ¶¶ 23–25, 62– 75. Therefore, any withdrawal of the granted motion to change venire by counsel in Robert's absence and over Robert's objection could not be knowing or voluntary. *See*, *e.g.*, *id.* ¶¶ 23–25, 69–93.

The Commonwealth similarly cites the Pennsylvania Supreme Court's *Mallory* decision, which Petitioner has often cited in support of his entitlement to relief. From it, the Commonwealth

quotes the proposition that "[a] waiver colloquy . . . is not a constitutional end or constitutional 'right.' Citizens can waive their fundamental rights in the absence of a colloquy . . . by conduct or by implication . . . ."  ECF 13 at 73 (citing *Commonwealth v. Mallory*, 941 A.2d 686, 697–98 (Pa. 2008)).[17]  The Commonwealth's appeal to *Mallory* is also unavailing.  First, *Mallory* is factually distinguishable because "there was a written waiver" that was extraordinarily detailed and that ensured the defendant's waiver was knowing, intelligent, and voluntary.  941 A.2d at 696–67.  Robert did not execute any written waiver.  And there are no other indications that "by conduct or by implication" he waived his right to a fair and impartial jury or consented to trial counsel's withdrawal.  *See id.* at 697–98.  And second, the Commonwealth's block quotation of *Mallory* encourages a totality of the circumstances analysis that would have required some indication that Robert was apprised of his rights by the trial court and then, understanding the risks involved, agreed to waive them.  *See id.*  As stated in Robert's Petition, Robert did not make any oral or written waiver.  ECF 2 ¶ 67.  Nor do any of the circumstances suggest that Robert provided his consent to trial by an Allegheny County jury "by conduct or by implication."  *See*, *e.g.*, *id.* ¶ 82.  An isolated conversation with his counsel, the contents of which are undisclosed, cannot substitute for the requisite waiver.

Absent credible evidence that Robert waived his right to trial by a fair and impartial jury, that Robert withdrew his motion to change venue, or that he knowingly and voluntarily intended for his counsel to do so either, Robert is entitled to relief for the violation of his un-waived rights occasioned by trial counsel's ineffectiveness. *See Carnley v. Cochran*, 369 U.S. 506, 515 (1962)

---

[17]  The Commonwealth also bold a citation to *Commonwealth v. Birdsong*, 24 A.3d 319, 338 (Pa. 2011), in a block quote from the Superior Court's PCRA opinion.  ECF 13 at 74.  *Birdsong* is equally irrelevant to the question before his Court for the same reasons *Mallory* is – especially because in *Birdsong* "there *was* an on-the-record oral colloquy."  24 A.3d at 341 (emphasis added).

("Presuming waiver from a silent record is impermissible. *The record must show*, or there must be an allegations and evidence which show, *that an accused was offered [his Sixth Amendment Right] but intelligently and understandingly rejected the offer.  **Anything less is not waiver.**") (emphasis added); *cf. Goodwin v. Smith*, 439 F.2d 1180, 1183 (5th Cir. 1971) (seeming acquiescence does not constitute waiver if not "voluntarily and understandingly" relinquished); *see also Wainwright v. Sykes*, 433 U.S. 72, 94, n.1 (1977) (Stevens, J., concurring) ("A decision by counsel may not be binding if made over the objection of the defendant . . . .") (citing *Paine v. McCarthy*, 527 F.3d 2d 173, 175–76 (9th Cir. 1975)).

Even the isolated reference defense counsel made to a conversation he had with Robert about waiver is unavailing to the Commonwealth's waiver argument. Counsel made it clear that he (not even Robert), was relinquishing the right to an unbiased jury only because the trial court indicated that a change of venue would cost him the right to a fair trial.  Counsel could not proceed under the conditions imposed by the court—extended trial hours (8 am to 8 pm), extended trial days (six days per week), and the consequent inability of Robert to adequately consult with counsel and prepare his defense. The Commonwealth does not address the trial court's unconstitutional conditioning of Robert's right to effective assistance of counsel against his right to trial by a fair and impartial jury.  *See* ECF 2 ¶¶ 81–93.  But that violation alone would also entitle Robert to relief.  *See Simmons v. United States*, 390 U.S. 377 (1968).  Had Robert, as the Commonwealth suggests, actually waived his right to the change of venire he had been granted, it would have been the involuntary result of the trial court's coercion on Robert and his attorneys.  *See* ECF 2 ¶¶ 81–93.

At bottom, whichever way the Commonwealth tries to explain Robert's trial by an irreparably prejudiced jury drawn from an unfair and partial venire over Robert's objection, the

evidence does not show that Robert knowingly, intelligently, or voluntarily waived his Sixth

Amendment right to trial by a fair and impartial jury—because he did not.  Because there was no

such waiver, Robert was tried and is being held in violation of the Sixth Amendment.

**IV.    Robert is Being Held in Violation of his Sixth Amendment Right to Effective Assistance of Counsel, who Facilitated his Trial by an Unfair and Partial Jury. (Claim II)**

Robert's trial counsel was ineffective and failed to protect Robert's right to a fair and

impartial jury.  Despite the trial court's unequivocal findings that a fair and impartial jury could

not be seated in Allegheny County, trial counsel inexplicably acquiesced to the trial court's

pressure (R.3296–98), and withdrew Robert's motion to change venire on the eve of trial—in

Robert's absence and over his objection.[18]   Robert's Sixth Amendment rights were violated

because trial counsel's motion withdrawal subjected Robert to a jury selected from a conclusively

unfair and partial venire. *See* R.6.; *supra* Part III.A. Trial counsel's conduct was objectively

unreasonable and caused Robert to suffer unnecessary and avoidable prejudice.

The ineffective assistance provided by Robert's trial counsel is three-fold.  Trial counsel

was ineffective in withdrawing Robert's granted motion for a change of venire.  ECF 2 ¶¶ 98–106.

---

[18]   In the course of PCRA proceedings, Robert submitted a letter describing conversations he had with his trial counsel about the trial court's pressure to withdraw his motion to change venire and select a jury from Allegheny County. *See generally* R.380–82.  This letter does not describe any discussion with his counsel (just as none was had with the Court) regarding the scope or importance of Robert's Sixth Amendment right to a fair and impartial jury, unprejudiced by rampant pretrial publicity. *Id.*  Rather, the letter recounts the (potentially *ex-parte*) pressure that trial counsel faced from the trial court judge:  "the judge was upset about the costs of hosting a jury panel and substitute jurors from Dauphin County;" "to reduce the trial costs, Judge Manning would attenuate the length of the trial time by expanding the trial hours from 8 AM to 8 PM and run the trial from Monday through Saturday;" "this scenario would allow very little or no time for us to meet after the trial each day …."  R.380.  Robert explains in this letter his feeling that he was being "coerced," "forced," and "threat[ened]" by the trial court to give up his change of venire (and, in effect, his Sixth Amendment fair trial right) "if [he] did not want an attenuated trial with a loss of meaningful understanding of evidence."  R.381.  This letter confirms that trial counsel conveyed the trial court's preferences and coercive constraints and that "[t]here was no colloquy with Judge Manning" on the subject and that Robert "neither read nor signed a waiver form."  R.381–82.

Trial counsel was ineffective in withdrawing the change of venire without a recorded colloquy of Robert. *Id.* ¶¶ 107–113. And trial counsel was ineffective in engaging in and allowing the trial court to pit Robert's right to effective assistance of counsel against Robert's right to trial by fair and impartial jury. *Id.* ¶¶ 84–97. Robert's Petition addresses each of these three violations of Robert's right to effective assistance of counsel. *See* ECF 2 ¶¶ 84–113. The Commonwealth does not meaningfully answer any of these violations.

First, the Commonwealth does not meaningfully answer Robert's request for relief from his trial counsel's ineffective assistance in withdrawing Robert's motion for a change of venire. *See* ECF 2 ¶ 96–106. The Commonwealth does not contest that it was ineffective assistance for Robert's trial counsel to allow Robert's trial by a jury from a venire in which "a fair and impartial jury cannot be impaneled." Trial counsel's assistance fell below any objective standard of reasonableness. *See* ECF2 ¶¶ 96–106. The Commonwealth does not assert that Robert's trial counsel had any conceivable basis to permit Robert's trial before an unfair and partial jury. There cannot be a strategic reason to try a case before a jury from a venire that cannot provide a fair and impartial jury. *See* ECF 2 ¶¶ 101–02. The Commonwealth does not meaningfully claim that the ineffectiveness of Robert's trial counsel did not prejudice him. The Commonwealth only incorporates its prior incorrect assertions about "actual" jury prejudice. ECF 13 at 73 (incorporating *id.* at 64–66); *but see supra* Part III.A. But as described above, the prejudice of the seated jury should be presumed and, even if examined, was exactly as anticipated by the trial court's initial findings: eight of twelve jurors were aware of Robert's case before reporting for jury duty.

Second, the Commonwealth does not answer Robert's request for relief from his trial counsel's ineffective failure to ensure an on-the-record colloquy before surrendering Robert's right

to an unbiased jury.  *See* ECF 2 ¶¶ 107–113.  This ineffective assistance deprived Robert of his right to exercise his constitutional right absent an express, valid (knowing, intelligent, and voluntary) waiver.  *See*, *e.g.*, *id.* ¶ 77.  It also led to the violation of Robert's right to a fair and impartial jury discussed in Robert's Petition and Part III above.  *See id.* ¶¶ 51–93.

Third, the Commonwealth does not answer—under Claim I or Claim II—Robert's request for relief from his trial counsel's role in pitting Robert's right to a fair and impartial jury against Robert's right to consult with counsel to ensure effective assistance (in light of the prolific scientific issues presented in the case).  *See id.* ¶¶ 84–97.  With counsel's assistance, the trial court impermissibly conditioned the opportunity to benefit from Robert's right to effective assistance of counsel on trial counsel's relinquishment of Robert's right to a fair and impartial jury.  *See id.* ¶ 93 (quoting *Simmons*, 390 U.S. at 394 (It is "intolerable that one constitutional right should have to be surrendered in order to assert another.")).

Robert was tried by a prejudiced jury selected from an unfair and impartial venire.  Robert is entitled to release or a new trial with effective assistance of counsel before a jury selected from a fair and impartial venire.

**CONCLUSION**

For the reasons stated herein, and the full record of this matter, Petitioner Robert Ferrante requests that the Court:

1.  Issue a writ of *habeas corpus* ordering that he be brought before the Court to be discharged from his unconstitutional confinement and be relieved of his unconstitutional convictions and/or sentences;

2.  Grant leave to amend this Petition, if necessary;

3.  Order such hearings as may be necessary to resolve Robert's and the Commonwealth's contentions and any disputed issues of fact;

4.  Allow for discovery as may be necessary to supplement the records provided by the Commonwealth, if necessary; and

5.  Grant such other relief as may be just and appropriate.

Date: February 20, 2025                              Respectfully submitted,


  */s/ Ronald S. Safer*

Ronald S. Safer* - IL 6186143
Matthew C. Crowl* - IL 6201018
   * counsel appearing *pro hac vice*
Blake J. Kolesa - IL 6339230
RILEY SAFER HOLMES & CANCILA LLP
One South Dearborn Street, Suite 2200
Chicago, Illinois 60603
(312) 471-8732
rsafer@rshc-law.com
mcrowl@rshc-law.com
bkolesa@rhsc-law.com

PETITIONER'S REPLY IN SUPPORT OF PETITION FOR *HABEAS CORPUS*